

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | |
| | ) | No. 38235-4-III |
| D.R. | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

SIDDOWAY, C.J. — A single issue in this appeal of a dependency finding is dispositive: where the trial court's factual findings do not support its conclusion of law that a child is dependent under RCW 13.34.030(6)(b) (abuse or neglect by a person legally responsible for her care), may we remand for the court to consider whether she is dependent under RCW 13.34.030(6)(c) (no parent, guardian, or custodian capable of adequately caring for her)?  In this appeal by D.R.'s[1] mother of an order finding D.R. dependent, the suggestion of the remedy of remand is made by the Department of Children, Youth, and Families (Department), which did not file a cross appeal.  Since the remedy of remand is not demanded by the necessities of the case, there is no basis under

---

[1] To protect their privacy, we use initials to refer to the minor children.  Gen. Orders of Division III, *In re Changes to Case Title* (Wash. Ct. App. Aug. 22, 2018).

our rules for ordering it.  The appropriate remedy is that requested by D.R.'s mother: we reverse the order finding D.R. to be a dependent child under RCW 13.34.030(6)(b).

## FACTS AND PROCEDURAL BACKGROUND

The following facts are taken almost entirely from findings of fact by the trial court to which no error has been assigned, and which are therefore verities on appeal.

The appellant is the mother of D.R., who is now approaching three years old. D.R.'s father is the single parent to a son, D.R.A., who is now almost six years old.[2]  As of October 2020, when an injury to D.R.A. occurred that led to this proceeding, D.R.'s mother and father were living together with the two children.  D.R.'s mother was the primary caregiver during the day for both D.R. and D.R.A. while the father worked.

On October 30, 2020, D.R.A., who was then three years old, suffered second and third-degree burns on the back of both hands and on the right wrist and forearm, while in the sole care of D.R.'s mother.  The mother had been preparing to give both children a bath and left D.R.A. in the bathroom while she stepped into the next room to remove then-10-month-old D.R.'s diaper.  The mother claims that in her momentary absence D.R.A. fell forward into a tub filled with water that was unusually hot, the result of recent installation of a new hot water tank.  Despite telling the children's father that she took

---

[2] D.R.A.'s biological mother passed away in early 2018.

D.R.A. to the doctor, D.R.'s mother did not seek medical treatment on that day and instead treated D.R.A. herself with burn spray, gauze bandages and Tylenol.

Later that day, a friend of D.R.'s mother visited the family. She observed D.R.A. with gloves on his hands and playing normally. D.R.'s mother told her friend about the burn and said she was worried about telling the children's father. The friend observed one of D.R.A.'s hands and would later testify that the injury was not that bad.

The children's father became aware of the injury but never observed it because D.R.'s mother took care of bandaging the wounds. She told the father she was following the doctor's medical advice, and that D.R.A. had a follow-up appointment on Monday.

D.R.'s mother took D.R.A. to the CHAS medical clinic on November 2, 2020. On examining the bandages, a doctor immediately sent D.R.A. to the emergency room at Sacred Heart Children's Hospital (SHMC).

Dr. Barger-Kamate, a board-certified pediatric physician with training and experience in child abuse, treated D.R.A. at SHMC. Dr. Barger-Kamate was alarmed at the depth of the burns and their condition. The burns were second-degree, or through the second layer of skin, and third-degree, all the way through the skin. They were so deep that Dr. Barger-Kamate was concerned about the risk of infection, the possible need for skin grafting, and the potential loss of mobility in the joints, particularly in the right hand due to constrictions. On the left hand, the skin was granular and sloughing off indicating a delay in treatment. The condition of the right hand was the most alarming due to

3

blackened tissue on the back of the hand going all the way up the arm, indicating that much of the tissue was dead.

D.R.'s mother told hospital staff that D.R.A. had fallen into the bathtub. She also told them she sought care from an urgent care center in the Spokane valley and that they told her to treat D.R.A. at home with bandages, burn spray, and Tylenol. She told them she had a follow-up appointment in a week. She was unable to provide the name of the urgent care center.

In Dr. Barger-Kamate's opinion, the burn pattern on D.R.A.'s hands was more consistent with water flowing over the hands. There were sharp demarcation lines showing where the water went over the hands and arm. In an accidental burn people will instinctively pull their hands out and there will usually be splash or drip marks. There were no splash or drip marks on D.R.A. In addition, there were no injuries to D.R.A.'s fingertips or palms. Dr. Barger-Kamate suspected that his hands had been purposefully burned by being held under water.

Dr. Barger-Kamate testified that given the depth of the burns, large blistering would have occurred within a few hours and it would have been evident to a reasonable parent that D.R.A.'s burns needed medical treatment within at least 24 hours of the injury. The burns would have been painful. Due to the burns' severity, Dr. Barger-Kamate sent D.R.A. to Seattle to be treated at Harborview Medical Center (Harborview).

She made a referral to the Safe Child and Adolescent Network team in Seattle to investigate whether the injury was nonaccidental.

At Harborview, D.R.'s mother again reported to treating providers that D.R.A. had fallen into a bathtub. She again claimed to have taken him to an urgent care center on the day of the injury and to receiving a recommendation of home care. Providers at Harborview questioned D.R.'s mother about which urgent care center she had visited, and neither the information she provided nor their own calls to facilities substantiated her report. When Harborview physician Dr. Katie Johnson reviewed pictures of D.R.A.'s hands and examined him, she, like Dr. Barger-Kamate, concluded that the burn patterns were not consistent with D.R.'s mother's explanation. Dr. Johnson concluded they were consistent, instead, with water flowing over D.R.A.'s hands for an estimated 6 to 21 seconds. She requested that an in-home burn investigation be conducted. Investigation by the Spokane County Sheriff's forensic unit determined that the family's new hot water tank was set at an unsafe temperature level.

On November 6, 2020, the Department filed dependency petitions against both parents seeking a determination of dependency as to D.R.A and D.R. In the petition, the Department alleged that the children could be found dependent under two of RCW 13.34.030(6)'s definitions: because the children were abused or neglected, and because the children had no parent, guardian, or custodian capable of adequately caring

for the child, such that the child was in circumstances constituting a danger of substantial damage to the child's psychological or physical development.

On November 19, 2020, D.R.'s mother was interviewed by Spokane County Sheriff's Detective Brad Humphrey and admitted to him that D.R.A.'s only treatment on the day of his injury was at home. She first told the detective that SHMC misunderstood what she had told them. After meeting with her attorney privately, however, she admitted to Detective Humphrey that she lied to SHMC about having sought medical care. She said that when she realized how bad the burns were, she was afraid that she would get in trouble.

A contested fact-finding hearing was held over six days in February and March 2021. It focused primarily on the injuries to D.R.A. and the parents' actions in response. Testimony about D.R. was very limited. For example, Jillian Gilbert, the Department's assigned social worker, could not say whether any of the professionals had concerns about the mother's behavior toward D.R. Nevertheless, Ms. Gilbert testified the Department had safety concerns for both children, characterizing both as young vulnerable children and stating that when one child does not get needed medical care, it is "very likely" that their sibling could suffer a serious injury and likewise fail to receive necessary medical care. Report of Proceedings (RP) at 615.

By the time of the contested hearing, D.R.'s mother had taken first aid and CPR (cardiopulmonary resuscitation) classes and had completed the Positive Parenting Program. She continued to visit with D.R. twice a week for four hours per day.

At the contested hearing, the Department contended that both children should be found dependent under RCW 13.34.030(6)(b), arguing that the court did not "have to wait for little [D.R.] to be abused or neglected." RP at 633. In response, counsel for D.R.'s mother emphasized that her client was not a party to D.R.A.'s case, being a parent to only D.R. She argued that the limited testimony elicited as to D.R. revealed that she and her mother were well bonded and the mother's actions toward D.R. were appropriate. She argued that the Department failed to meet its burden to prove that D.R. was abused or neglected. In rebuttal, the Department repeated its earlier assertion that the court did not have to wait for abuse:

> (Inaudible), we do not have to wait—and the case law says this—do not have to prove that the new baby was abused or neglected. *In re Ferguson*, (inaudible), newborn child was found to meet the definition of abused or neglected even though she'd never been in the parent's care. I could cite multiple authorities regarding that. The history of parenting (inaudible)—do not have to have had abuse of [D.R.] to occur for this child to be found dependent. That is an erroneous—not supported by the law.

RP at 652.

As requested by the Department, the trial court's written order found D.R. dependent as to her mother as defined by RCW 13.34.030(6)(b). It found both children dependent as to their father as defined by RCW 13.34.030(6)(c).

7

D.R.'s mother appealed. While the appeal was pending, the trial court dismissed the dependency proceeding for D.R. on the Department's motion, on the basis that a permanent plan of return to the home of the father was achieved and court supervision was no longer needed. *See* Order Dismissing Dependency, *In re Dependency of D.R.*, No. 38235-4-III (Dec. 27, 2021) (on file with court).

ANALYSIS

D.R.'s mother assigns error to six of the trial court's findings and its conclusion of law that D.R. is dependent as to her mother as defined by RCW 13.34.030(6)(b). Although acknowledging that the dependency was dismissed while this appeal was pending, she points out that the appeal is not moot because she can still be afforded meaningful relief from the collateral consequences that flow from a dependency finding under RCW 13.34.030(6)(b). Br. in Support of Mot. for Accelerated Rev. at 9 n.3 (citing *In re Dependency of H.S.*, 188 Wn. App. 654, 662, 356 P.3d 202 (2015)). The State does not disagree.

The State now concedes the trial court erred by finding dependency under subsection (b), abandoning its argument at trial that the court does not have to wait for abuse or neglect to occur in order to declare the child dependent under RCW 13.34.030(6)(b). While conceding error, the Department argues we should remand the case to the trial court to determine whether the evidence supports a finding of dependency under RCW 13.34.030(6)(c). This is appropriate, it argues, because "the trial

8

court did not rule on the petition's allegation that D.R. is dependent under RCW

13.34.030(6)(c) because [her mother] is not capable of adequately parenting her." Br. of

Resp't at 2.[3]

If the Department believes it was error for the trial court to fail to address both

bases for dependency identified in its petition regardless of the position it took at the

hearing, it could have cross appealed the trial court's failure to address whether D.R. was

dependent as to her mother as defined by RCW 13.34.030(6)(c). It did not file a cross

appeal, however, and for understandable reasons: it would have been met with arguments

that (1) it abandoned the subsection (c) basis at the hearing and there was no error, or (2)

if a trial court should ordinarily address all bases identified in a petition, any error was

invited by the Department's position at the hearing.

An appellate court can still grant affirmative relief to a respondent who fails to file

a cross appeal if the necessities of the case demand it. RAP 2.4(a); *State v. Sims*, 171

Wn.2d 436, 443, 256 P.3d 285 (2011). Washington courts generally apply the necessities

provision of RAP 2.4(a) when an appellant's claim cannot be considered separately from

---

[3] The petition does not explicitly refer to RCW 13.34.030(6)(c), nor does it specify as to each parent the basis or bases for dependency on which the Department relied.

We assume the Department is referring to section 1.4 of the petition. In completing that section of the form dependency petition, the Department checked the preprinted allegations that "[t]he child is dependent according to RCW 13.34.030(6) in that . . . the child is abused or neglected . . . [and] the child has no parent, guardian or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." Clerk's Papers at 2.

No. 38235-4-III
*In re Dependency of D.R.*

an issue raised in response. *Id.* at 444. The Department does not present any argument why the mother's assignment of error cannot be considered separately from its suggestion, for the first time on appeal, that the trial court should have ruled on both bases for dependency identified in its petition.

The remedy sought by the Department is affirmative relief for which it did not file a cross appeal and which is not demanded by the necessities of the case.

The dependency order is reversed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Fearing, J.

Pennell, J.

10